**TRUSTEES OF THE ALA–LITHOGRAPHIC PENSION PLAN, Plaintiff,**

v.

**CRESTWOOD PRINTING CORPORATION, Defendant.**

**No. 99 CIV. 4432(CBM).**

United States District Court, S.D. New York.

April 19, 2001.

Ira Cure, Kennedy, Schwartz & Cure, P.C., New York City, for Plaintiff.

Mark S. Mancher, Elliot D. Bernak, Jackson, Lewis, Schnitzler & Krupman, Woodbury, NY, for Defendant.

### *MEMORANDUM OPINION*

MOTLEY, Senior District Judge.

Plaintiff, Trustees of the ALA–Lithographic Industry Pension Plan ("Trustees"), filed this action on June 21, 1999 against employer, Crestwood Printing Corporation ("Crestwood"). Plaintiff alleges that Crestwood failed to make obligatory pension plan contributions in violation of section 515 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1145, and section 301(a) of the Labor Relations Management Act ("LMRA"), 29 U.S.C. § 185(a). The parties stipulate that the amount of damages in dispute is

$89,261.67. Having held a two-day bench trial in January 2001, this court now finds in favor of defendant Crestwood.

## I.  BACKGROUND [1]

The Amalgamated Lithographers of America, Local One ("the union") and Crestwood are parties to a collective bargaining agreement. Pursuant to the collective bargaining agreement, Crestwood is required to make pension contributions as a percentage of its employees' base pay. The disagreement between the parties involves the calculation of base pay for the purposes of the pension contribution. Plaintiff Trustees allege that base pay includes both regular shift pay and overtime pay. Crestwood alleges that base pay includes only regular shift pay. Three agreements between the union and Crestwood are involved.

### A.  The MLA Agreement

The first agreement ("the MLA Agreement"), controlling from July 1, 1994 to June 30, 1997, was a collective bargaining agreement between the union and the Metropolitan Lithographers Association ("MLA"). The MLA is a multi-employer collective bargaining group that represents various employers in the lithographic industry and which negotiates collective bargaining agreements on behalf of those employers with the union. When the MLA Agreement was executed, Crestwood was a member of the MLA.

The MLA Agreement *excluded* overtime pay in the base pay calculation. *See* Def.'s Ex. 10; Tr. 7–8. In addition, one of the provisions of the MLA Agreement is a "Most Favored Nations Clause" that precludes the union from offering better contract terms to non-MLA employers than it

---

1.  Unless otherwise noted, the following factual information is taken from the Stipulations and Statements of Uncontested Facts in the parties' Joint Pre–Trial Order.

offers to the MLA. *See* Def.'s Ex. 10. This provision does not limit the union from offering the non-MLA employers the same contract terms that it offers to the MLA. *See* Tr. 20.

During the same period of time covered by the MLA Agreement, the union offered a Standard Independent Agreement to most non-MLA employers. One way in which the Standard Independent Agreement differed from the MLA Agreement is that overtime pay was *included* in the base pay calculation. *See* Def.'s Ex. 12; Tr. 7–8.

### 1. The Barton Agreement

The union does not always require independent employers to make pension contributions based on overtime. The union conceded that as part of its contract negotiations with the following non-MLA employers, pension contributions would be based on a base pay calculation that *excluded* overtime pay: TFH, Atwater America, Quality Color, Integrated Imaging, and Barton Press. *See* Tr. 20–21. Thus, despite the Most Favored Nations Clause in the MLA Agreement, the union was able to offer the same term concerning pension contributions to these non-MLA employers that it offered to the MLA.

Robert Kashan, in addition to being CEO and president of Crestwood, is also CEO of Barton Press, another non-MLA employer. With respect to Barton Press, Kashan specifically bargained with Patrick LoPresti, the union's president, for an agreement which excluded overtime from the base pay calculation. At the time the negotiations commenced, Barton Press was bound by the existing MLA Agreement. *See* Tr. 22. On March 6, 1997, prior to the negotiations regarding Crestwood, Kashan and LoPresti negotiated a Memorandum of Agreement for Barton commencing July 1, 1997 ("the Barton Agreement"). The Barton Agreement provided that Barton would be bound by the independent employer agreement but that it would incorporate the agreements respecting wages and benefits reached between the union and the MLA for the period of July 1, 1997 to June 20, 2000. *See* Def.'s Ex. 8. This meant that Barton's contributions to plaintiff *excluded* overtime pay from the base pay calculation.

Attached to the Barton Agreement, at the time it was executed, was a copy of the Standard Independent Agreement. LoPresti modified the Standard Independent Agreement to conform with the Barton Agreement by crossing out and initialing the line requiring pension contributions based on overtime pay. *See* Def.'s Ex. 3; Tr. 27.

### B. The 1997 MOA

In April 1997, Crestwood withdrew from the MLA. *See* Tr. 10–11, 93. Crestwood notified the union of its withdrawal from the MLA in April 1997. *See* Def.'s Ex. 17; Tr. 11. According to the terms of the MLA Agreement, "every member of the Association shall be individually bound hereby whether or not such member continues to be a member of the Association." Def.'s Ex. 10. LoPresti, the union president, testified that this language meant that Crestwood was still bound by the terms of the MLA Agreement upon its withdrawal from the MLA. *See* Tr. 41, 50–51. In particular, LoPresti admitted that during labor negotiations it is standard practice that if there is no meeting of the minds with regard to the terms of a new collective bargaining agreement, the previous agreement remains in place until a new agreement is reached or an impasse is declared. *See id.* The only agreement in effect between the union and Crestwood at the time of Crestwood's withdrawal from the MLA was the MLA Agreement. *See* Tr. 50–52, 102.

After Crestwood's withdrawal from the MLA in April 1997, Kashan and LoPresti negotiated a new agreement for Crestwood in the form of a Memorandum of Agreement which was executed in mid-July 1997 and which covered the period from July 1, 1997 to June 30, 2001 ("the 1997 MOA"). Kashan testified that he negotiated an agreement in which pension contributions would exclude overtime pay from the base pay calculation. *See* Tr. 95–96. Kashan testified that in exchange for this concession on the union's part, Crestwood agreed to recognize a new class of employees, electronic pre-press operators, which was an issue of importance to the union. *See* Tr. 95–96. LoPresti testified that, on the contrary, the agreement negotiated with Crestwood did not authorize Crestwood to make pension contributions that excluded overtime pay. *See* Tr. 14. The agreement which was reached between the union and Crestwood was memorialized in the 1997 MOA which was drafted by the union and which did not refer specifically to the issue of pension contributions. Rather, the 1997 MOA stated that "the terms and conditions of employment set forth in the existing collective bargaining agreement by and between the Union and the Employer shall continue in effect." Def.'s Ex. 1.

After signing the 1997 MOA, Crestwood made pension contributions to the pension fund that excluded overtime pay from the base pay calculation. *See* Tr. 54, 103. LoPresti knew as of late 1997 or early 1998 that Crestwood was excluding overtime from its pension contributions. *See* Tr. 55–56. The pension fund's ledger books from April 1997 to December 1999 do not indicate that Crestwood underpaid or was in arrears. *See* Pl.'s Ex. 6.

It is the union's normal practice to provide formalized contracts in book format memorializing the agreements previously entered between employers and itself. LoPresti testified that an employer has the right to expect that the union will produce a contract booklet that accurately reflects the terms negotiated and set forth in the Memorandum of Agreement. *See* Tr. 45–46. The 1997 MOA was not formalized into a contract booklet until the spring of 1999. *See* Tr. 53.

## C. Agreement # 3

The third agreement between the union and Crestwood, executed in 1999, was a formal collective bargaining agreement between the union and Crestwood for the July 1, 1997 to June 30, 2001 time period ("Agreement # 3") and *included* overtime pay in the base pay calculation. *See* Def.'s Ex. 2.

Joseph Calderone, Director of Organizing for the union, presented Agreement # 3 for signing to Harry "Hap" Ajamian, the Secretary–Treasurer of Crestwood. *See* Tr. 78. Since 1996, Ajamian did not have any responsibilities with regard to contract negotiations with the union and was not involved in the financial aspects of Crestwood's business. *See* Tr. 116. Calderone directed Ajamian where to sign. *See* Tr. 85. The terms contained in Agreement # 3 were not discussed. *See* Tr. 78. Calderone neither threatened Ajamian nor did Calderone stop Ajamian from reading the contract. *See* Tr. 126. Ajamian signed Agreement # 3 without reading it. *See* Tr. 120, 126.

Ajamian testified that he signed Agreement # 3 because he assumed Agreement # 3 contained the same terms and conditions that were contained in the 1997 MOA that had been in effect for the previous two years. *See* Tr. 120. Ajamian testified that based on this assumption, he did not read Agreement # 3 before signing it. *See id.* Because he believed Agreement # 3 simply formalized the agreement contained in the 1997 MOA, Ajamian did not show Agreement # 3 to Kashan. *See* Tr. 120–121.

After Agreement # 3 was signed by Ajamian, the union's legal counsel sent a letter to Crestwood dated May 28, 1999 demanding additional pension contribution payments based upon a base pay calculation that included overtime. *See* Pl.'s Ex. 18. This was the first time Crestwood received notice that the union believed Crestwood owed additional pension contributions to the pension fund. *See* Tr. 54, 103.

### D. Crestwood's Motion for Summary Judgment

Crestwood moved for summary judgment on July 31, 2000 arguing that the 1997 MOA constituted the agreement between the union and Crestwood and that the 1997 MOA referred to an existing collective bargaining agreement, the MLA Agreement, which *excluded* overtime pay from the base pay calculation. On September 18, 2000, this court ruled, in denying Crestwood's summary judgment motion, that the language of the 1997 MOA was ambiguous as to which "existing collective bargaining agreement" the 1997 MOA was meant to encompass. *See Trustees of the ALA–Lithographic Pension Plan v. Crestwood Printing Corp.* 113 F.Supp.2d 611, 613 (S.D.N.Y.2000).

### E. Trustees' Motion *in Limine*

■ On January 11, 2001, this court denied Trustees' motion *in limine.* In its motion, Trustees sought to preclude Crestwood from arguing that Agreement # 3 was void *ab initio* due to fraud in the execution. Trustees also sought to exclude certain evidence pertaining to the interpretation of the 1997 MOA. As to the

validity of Agreement # 3, this court held that Crestwood's fraud in the execution defense was not barred by ERISA § 515[2] and was not preempted by the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158. As to the interpretation of the 1997 MOA, this court held that Crestwood's ratification defense was not preempted by the NLRA. For a more detailed discussion of this court's holdings, see *Trustees of the ALA–Lithographic Pension Plan v. Crestwood Printing Corp.,* 127 F.Supp.2d 475 (S.D.N.Y.2001).

## II. DISCUSSION

To resolve this case, this court must decide two issues. First, this court must determine what agreement is referenced by the terms of the 1997 MOA, the MLA Agreement or the Standard Independent Agreement. Second, this court must determine whether or not Agreement # 3 is void and unenforceable by virtue of fraud in the execution. If Agreement # 3 is not void, then Trustees must prevail. However, if Agreement # 3 is void and unenforceable, then this court must look to the 1997 MOA as the controlling agreement between the union and Crestwood.

### A. 1997 MOA

■ The parties give two different meanings to the terms of the 1997 MOA. Trustees argue that the 1997 MOA's reference to "the existing collective bargaining agreement" referred to the existing Standard Independent Agreement for 1994–1997, which was in use for most non-MLA employers. The Standard Independent Agreement *included* overtime pay in the

---

**2.** Fraud in the execution arises when a party executes an agreement "with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms." Uniform Commercial Code § 3–305(2)(c); *see also* Restatement (Second) of Contracts § 163. Fraud in the inducement occurs when a party is induced to assent to

something he otherwise would not have. *See* 12 Williston on Contracts § 1488, at 332. The court notes that the defense of fraud in the inducement is not available in an ERISA § 515 action. *See Southwest Administrators, Inc. v. Rozay's Transfer,* 791 F.2d 769, 773–74 (9th Cir.1986).

base pay calculation. Disputing Trustees' interpretation, Crestwood argues that "the existing collective bargaining agreement" referred to the MLA Agreement, to which Crestwood had been bound as a member of the MLA, and which *excluded* overtime pay from the base pay calculation.

This court holds that the 1997 MOA's reference to "the existing collective bargaining agreement" referred to the MLA Agreement. The evidence is clear that the MLA Agreement was the only collective bargaining agreement in existence between the union and Crestwood at the time the 1997 MOA was signed. LoPresti testified that during labor negotiations it is standard practice for the previous agreement to remain in place until a new agreement is reached. Furthermore, the evidence is compelling that LoPresti and Kashan agreed that Crestwood would be bound by the terms of the MLA Agreement with regard to pension contributions. The union did allow some independent employers to exclude overtime pay when making pension contributions. In fact, Kashan had negotiated such an agreement with the union with respect to his other independent shop, Barton Press, only months before negotiating the Crestwood contract. This court also credits Kashan's testimony that Crestwood bargained for such an arrangement regarding pension contributions in exchange for recognition of electronic pre-press operators.

According to the terms of the 1997 MOA, as interpreted by this court, Crestwood was not obligated to make pension contributions which included overtime pay in the base pay calculation. Therefore, unless Agreement # 3 superceded the 1997 MOA, Crestwood's pension contributions to Trustees were not deficient.

**B. Agreement # 3**

■ By its terms, Agreement # 3 requires Crestwood to make pension contributions that include overtime pay in the base pay calculation. Crestwood has submitted evidence with the purpose of establishing that Agreement # 3 was procured by fraud in the execution and is therefore void *ab initio*. A contract is deemed void due to fraud in the execution "where there is a 'misrepresentation as to the character or essential terms of a proposed contract,' and a party signs without knowing or having a 'reasonable opportunity to know of its character or essential terms.' " *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 31 (2d Cir.1997) (*quoting* Restatement (Second) of Contracts § 163 comment a (1981)).

■ This court holds that the union committed fraud in the execution by intentionally substituting a Standard Independent Agreement to Ajamian that was materially different than the 1997 MOA in effect at the time. The union did so without disclosing the difference in the agreements and did so under circumstances in which Crestwood did not know or have a reasonable opportunity to learn that Agreement # 3 was a materially different agreement. *See Hetchkop*, 116 F.3d at 31. Crestwood has established at trial that Calderone did not inform Ajamian that the terms of the agreement varied from the 1997 MOA, and that Ajamian, the Crestwood officer who signed Agreement # 3 in 1999 without reading it, was under the impression that the document was merely a routine formalization of the terms of the existing 1997 MOA. The union's silence in the face of Ajamian's assumption that Agreement # 3 merely formalized the terms that had been in effect for the prior two years constituted a concealment of facts. *See, e.g., General Electric Capital Corp. v. Armadora*, 37 F.3d 41, 45 (2d Cir.1994). Furthermore, this court finds that the timing of this suit—Trustees did not commence this action until shortly af-

ter Agreement #3 was signed even though almost two years had elapsed since the execution of the 1997 MOA—substantiates Crestwood's fraud in the execution claim.

Trustees have argued that Ajamian had many years experience dealing with the union and had a basic responsibility to review the document before signing it. It is the general rule that parties must abide by the basic duty to read a contract before signing. *See Hetchkop*, 116 F.3d at 34. However, in this case, Ajamian was not signing a newly negotiated contract. Rather, Ajamian was signing what he believed to be a formalization of a contract that the parties had been operating under for almost two years. Under these circumstances, Ajamian's failure to read the contract before signing it does not absolve the union of its fraud.

Because this court finds that Agreement #3 was procured by fraud in the execution rendering it void *ab initio*, the controlling agreement between the union and Crestwood is the 1997 MOA.

## III.  CONCLUSION

This court holds that Agreement #3 between the union and Crestwood is void *ab initio* due to fraud in the execution. Because Agreement #3 is unenforceable, the controlling agreement between the union and Crestwood is the 1997 MOA. This court holds that the terms of the 1997 MOA's reference to "the existing collective bargaining agreement" referred to the MLA Agreement which did authorized Crestwood to make pension contributions that excluded overtime pay from the base pay calculation. Therefore, because Crestwood is not delinquent in its pension contributions to Trustees, this court finds in favor of defendant Crestwood.

Under 29 U.S.C. § 1132(g), defendant cannot recover attorneys' fees and costs expended in defense of a 29 U.S.C. § 1145 claim for alleged delinquent contributions. Therefore, this action is DISMISSED without the award of attorneys' fees or costs to the prevailing party, defendant Crestwood.